
REC'D IN PRO SE OFFICE
APR 4 '24 PM3:07

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 04 2024 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————X

UNITED STATES OF AMERICA,

    -v-

BAHADER THIARA,
             Defendant.

———————————————————————X

Case No. 1:19-cr-554-ENV-1

**MOTION FOR REDUCTION OF
SENTENCE PURSUANT TO
18 U.S.C. § 3582(c)(1)(A)**

I, Bahader Thiara, defendant herewith, move under 18 U.S.C. § 3582(c)(1)(A)(i) that this Court grant me a sentence reduction to time served[1] and impose such other conditions as the Court considers to be appropriate.

### I. Summary

1.    I seek a sentence reduction to time served after having been imprisoned continuously since July 20, 2023, a period of nine months. I seek compassionate release because of the deteriorating mental state of my spouse and the need to care for my son's autistic condition. The sentence I have already served constitutes just punishment, and my record since conviction clearly shows that I have been rehabilitated and that the public will not have to be protected from me.

---

[1]    Currently, the Bureau of Prisons sets my release date as April 29, 2026, about 25 months from now.

## II.    Exhaustion of Remedies

2.     The Federal Bureau of Prisons at my institution requires that inmates use a particular form in asking the warden to recommend that the BOP bring a compassionate release motion on their behalf. I used such a form, a copy of which is attached as **Exhibit 1**.  On October 17, 2023, I asked that the BOP recommend me for compassionate release based on my wife's mental condition and my son's autism and need for me as a caregiver.  Thirty days passed without a response from the Camp Administrator, to whom the BOP staff directed my request.

## III.    Facts

3.     *Conviction:*    On November 21, 2019, I was charged with access device fraud in violation of 28 U.S.C. § 1029(a)(2) and money laundering conspiracy in violation of 18 U.S.C. § 1956(h) and (a)(1). *Indictment,* ECF 37. On October 30, 2020, pursuant to a plea agreement, I pled guilty to one count of access device fraud and one count of money laundering conspiracy. ECF 50. This Court sentenced me to 42 months of incarceration, two years of supervised release, and a $200.00 special assessment. *Judgment in a Criminal Case,* ECF 66, entered May 2, 2023.

4.     *Offense Conduct:*    Between 2013 and the end of 2017, I controlled more than twenty synthetic identities that held credit cards at various financial institutions.  I used these synthetic identities to make fraudulent purchases using credit cards in the names of the various synthetic identities. I also controlled a number of shell companies that could accept purchases from fraudulent credit cards I controlled. I instructed others on how to operate the same scheme. I was personally responsible for a loss to financial institutions of $1,952,330.00.

5.     I have no one to blame but myself for my misconduct. My thinking that I was not hurting any real people but just corporations was wrongheaded.  Now, over six years after I

ended my involvement in the fraud, I reflect on my behavior with regret and unhappy amazement that I would ever have participated in such a scheme.

6. **_Post-Arrest:_** I was entrusted with release prior to my guilty plea, prior to sentencing, and after sentencing until my self-surrender. I remained in this status for almost 49 months. During that time, I worked at gainful employment, supported my family, committed no new offenses, and complied with this Court's conditions of release. I self-surrendered to prison as I was directed to do on July 20, 2023.

7. Prior to my sentencing, the amount of money seized from me or voluntarily paid to the government was about $2,030,972, about $78,641 more than the $1,952,330 loss I caused financial institutions.

8. Prior to my sentencing and without any promise of the possibility of a USSG § 5K1.1 or _F.R.Civ.P._ 35(b) motion, I provided the government with 35 to 40 pages of information about other named and unnamed defendants engaged in access device fraud. I also identified the source of the information I provided the government and convinced the source to come to the United states from his home country in order to meet with the government. I subsequently provided additional information about the leader of the scheme, who had been charged but was nevertheless continuing his fraud activities, to the government.

9. **_Post-Conviction:_** As of April 20, 2024, I will have served 28% of my current statutory sentence. _See_ Sentencing Monitoring Computation Data, attached as **Exhibit 2.** However, I am eligible to earn time credits ("FSA Credits") under 18 U.S.C. § 3632(d). _See_ Recidivism Risk Assessment, attached as **Exhibit 3.** As of January 4, 2024, I had earned 50 days of FSA Credits under that statute, and as of January 20, 2024, I began earning 15 days monthly. Those FSA Credits are credited toward a reduction in my sentence length. _See_ 18

U.S.C. § 3624(g)(3). This should fix my statutory release date at about August 20, 2025. Thus, I have served about 36% of my statutory sentence, as modified by the *First Step Act*.[2]

  10. Since my incarceration, I have had no discipline reports, and I am classified as a minimum-security prisoner with OUT custody (meaning that I need not be confined behind a fence). *See* Male Custody Classification Form, attached as **Exhibit 4**. This Court found that I had no criminal history points (but I am not eligible for a reduction under USSG 4C1.1 because I received a USSG § 3B1.1 enhancement). My risk of recidivism is low for general recidivism and minimum for violence. *See* Recidivism Risk Assessment, attached as **Exhibit 5**.[3]

---

[2] These so-called earned-time credits (or "FTCs" or "FSA credits") are part of a program authorized by the § 102 of the *First Step Act, supra* to reduce recidivism by providing cognitive behavioral therapy programs and other life skills training to federal inmates, a culmination of a bi-partisan effort to improve criminal justice outcomes, as well as to reduce the size of the federal prison population while also creating mechanisms to maintain public safety. *See First Step Act of 2018 – An Overview* (Congressional Research Service, March 4, 2019), found at https://crsreports.congress.gov/product/pdf/R/R45558 (last accessed March 1, 2024).

[3] The *First Step Act* required the Dept. of Justice to develop "a risk and needs assessment system, which shall be used to… determine the recidivism risk of each prisoner as part of the intake process, and classify each prisoner as having minimum, low, medium, or high risk for recidivism… assess and determine, to the extent practicable, the risk of violent or serious misconduct of each prisoner… [and] determine the type and amount of evidence-based recidivism reduction programming that is appropriate for each prisoner and assign each prisoner to such programming accordingly…" *Id.* at § 101(a), 132 Stat. 5197, *codified* at 18 U.S.C. § 3632(a). Pursuant to its mandate, the Dept. of Justice developed the *Prisoner Assessment Tool Targeting Estimated Risk and Needs* system ("PATTERN"). Dept. of Justice, *The First Step Act of 2018: Risk and Needs Assessment System* (July 19, 2019) ("PATTERN I") at pp. 21, 43. PATTERN "predict[s] the likelihood of general and violent recidivism for all BOP inmates over a three-year follow-up period." PATTERN I at p. 43.

Found at https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system_1.pdf (last visited March 1, 2024). PATTERN was modified and adopted in final form on January 15, 2020. Dept. of Justice, *The First Step Act of 2018: Risk and Needs Assessment System Update - January 2020* (January 15, 2020) ("PATTERN II"). Found at https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf (last visited March 1, 2024).

11.     Under 18 U.S.C. § 3624(c)(2), I will be eligible to serve my last four months of incarceration in home confinement. 2 this means that I should be released to home confinement about 13 months from the date I file this *Motion.*

12.     ***Family Medical Condition:*** Since I began my sentence in July 2023, the medical conditions and developmental disabilities faced by my son, Gurveer, have worsened. At the same time, my wife has developed a serious depressive disorder that renders her incapable of caring for our son's special needs.

13.     ***Gurveer Thiara:*** My *Presentence Report* discusses Gurveer at¶ 65. Gurveer was seven years old when the PSR was written. He is now ten. *See* Declaration of Simran Thiara, his older sister, attached as **Exhibit 6.** Gurveer suffers from Autism Spectrum Disorder and ADHD.[4] Declaration of Perminder Thiara, attached as **Exhibit 7**; *see also* letter from Mayank Patel, M.D., attached as **Exhibit 8** (Gurveer has "a long standing history of language delays, fine motor difficulties, delayed social skills and challenges developing written language skills").

14.     Gurveer was tested several months ago by Jeffrey Rubin, Ph.D., a psychologist. My wife, Perminder, and I have been concerned about what she has perceived to be deterioration in Gurveer's abilities since I began serving my sentence last July. The psychologist determined that Gurveer tested "extremely low" – that is, with a significant deficit – in the domains of General Adaptive Composite, Conceptual and Practical. He was below average but not deficient in Social. *See Psychological Assessment of Adaptive Functioning* report, attached as **Exhibit 9.**[5]

---

[4]     The *PSR* reports that Gurveer's autism diagnosis was "provisional." This was true at the time. However, since the *PSR* was written, subsequent diagnosis has confirmed that he is austitic. *See* **Exhibits 8** and **9.**

[5]     These Domains are part of the Adaptive Behavior Assessment System-III test. Dr. Rubin explains that "[a]daptive skills are everyday living skills such as walking, talking, going to

15.    Dr. Rubin concludes:

it should be noted that assessment at this age is considered to be a fairly reliable indicator of an individual's future functioning and potential. At later ages, he may score only modestly higher or possibly lower depending on factors of native ability as well as environment. Gurveer's overall Adaptive Behavior profile reflects Extremely Low (deficient) functioning across most measured skill areas. Gurveer's profile of Adaptive Skills showed significant variability between the measured Skill areas: His highest Scaled Score was 9 (in the Average range), occurring in Community Use skills. His lowest Scaled score was 1 (falling within the Extremely Low/Deficient range) and occurred in the Self-Care domain. His summary (General Adaptive Composite, or GAC) score of 68 on the ABAS-III places him in the "*Extremely Low/Deficient*" Classification range. His profile is notable for his relative strength in Community Use and for his relative weaknesses in Self-Care skills.

**Exhibit 9,** p.3. Prior to July 2023, Gurveer was rated in the ABAS-III as "low average." **Exhibit 8,** p. 3.

16.    Simran Thiara is a 16-year-old junior in high school. She has observed changes in her brother's condition since last July, when I began my sentence. **Exhibit 6.** She reports that Gurveer has become withdrawn, no longer interacting with his circle of friends. She says that Gurveer (who already has very deficient self-care skills, according to Dr. Rubin), "resists basic tasks such as showering, dressing, and getting haircuts, activities that were once shared moments" with me. She says that Gurveer shows increased susceptibility to ear infections and colds, which lead to more frequent absences from school. His health challenges are harming his schooling (he is in a special school) and "making it increasingly difficult for him to cope academically," Simran says. *Id.*[6]

---

school or work, personal hygiene and getting dressed. This scale is designed to evaluate whether Gurveer displays the various functional skills necessary for successful daily living without assistance of others and focuses on tasks he can perform independently." *Id.*

[6]    When the *PSR* was written, Gurveer had an IEP (Individualized Educational Program (IEP) in a regular school. *Id.* Since then, he has been placed in a special needs school geared to children with his mental health and developmental challenges. **Exhibit 7,** p.2.

6

17.     The *PSR* reports that he has "social communication deficits, restrictive and repetitive behavior, weaknesses with social insight and pragmatics, and inconsistent nonverbal social-communication behaviors." This has worsened materially since the *Presentence Report* was written in 2021 and especially since last July. Simran states that my absence "is really taking a toll on him, in a different direction, where it can make his autism and ADHD worse." She says, "Gurveer has also been disengaging from essential therapies, including speech and ABA therapy, further complicating his support system and overall well-being, jeopardizing his future success, given my father's absence." **Exhibit 6.**

18.     My wife, Perminder, states that Gurveer "requires constant adult assistance to complete his activities of daily life, such as dressing and hygiene, getting to and from (and participating in) medical and therapy appointments, and in participating in social activities. He is now enrolled in a special school, and he has a number of therapies he is to do at home. He needs supervision for these." **Exhibit 7,** p.2.

19.     She reports that Gurveer is constantly morose: "He doesn't want to go out, he just sits at home in his room and he'll look at a tablet or laptop without interest. He doesn't want to do anything, he doesn't want to go out, he refuses to shower, and he has been ill with colds, ear infections, and throat infections." *Id.* Perminder states that she is not able to compel him to complete his homework, which he and I used to do together. She says that his response now is "you know I'm not up to it, I don't want to do it, I don't understand." *Id.* at p.3.

20.     ***Perminder Thiara:*** My wife, Perminder, has been treated for depression and anxiety since July 2022. Since I began my sentence in July 2023, her symptoms have been worsened by my absence and the additional strain placed on her to care for our children and my

---

parents.[7] Her psychologist has diagnosed her as suffering from major depressive disorder with anxious distress. *See* Statement of Denise Schieren, Psy.D., attached as **Exhibit 11.** Dr. Schieren has stated that "Ms. Thiara's symptoms are impairing her ability [to] work, impacting her ability to sustain concentration and attention and complete tasks. Ms. Thiara will continue to attend weekly individual psychotherapy sessions addressing her symptoms, in addition to medication management with [her primary care physician] Dr. Wiqas." *Id.*

21.     Perminder was employed as a project manager but she has had to quit work because of her mental health condition. **Exhibit 7, p.1; Exhibit 11.** She is unable to concentrate even intermittently. *Attending Physician's Statement,* **Exhibit 12.**

22.     Simran states that "[m]y mother is really sad. Sometimes she's just sitting around crying. She has no energy to go anywhere and she forgets things, which is really bad because she's raising two children and we also need help and now that my dad isn't here there's really it's taking a toll on everyone. Since my father left, my mother no longer even performs simple tasks like talking to us, checking up on us. She just wants to be alone in her room, and that's an impact, because we all would go out as a family but that's not happening anymore." **Exhibit 6,** pp. 1-2. Simran says that her mother hardly ever drives anymore or escorts Gurveer to extracurricular activities. She no longer prepares the special diet Gurveer is to eat (such as plant-based milk, gluten-free foods, and unprocessed foods). As a result, Gurveer is defaulting to an unhealthy diet of sandwiches, chicken nuggets, and macaroni and cheese – the kind of thing a preteen boy would eat all the time without supervision. *Id.*

---

[7]     The *PSR* reported that I said that "my parents currently care for the[] children during the day while he and his wife are at work." *Id.* at ¶ 65. That was true at the time, but is true no longer. Both parents have aged since the *PSR* was written and have suffered from worsened diabetes and other ailments. It has fallen on Perminder's shoulders to care for them as well as for the children.

23.     My wife explains that with her disorders, "I will be sitting and thinking of something, and all of a sudden I can't breathe or break out in a sweat. I am now suffering from depression. I forget things I never had trouble remembering before, and sometimes my speech gets blurred – I can't pronounce certain words that I used to use – and my eyesight has gotten weak. I have to strain them more in order to read like even a bottle. I have suffered weight gain, and I find it difficult to leave my room or find the energy to do anything." **Exhibit 7,** p. 1. As a result, she has not been able to care for Gurveer, who relied heavily on my husband for supervision and guidance. She cannot even do what she did before I left, let alone provide the care Gurveer was getting from me.

24.     ***Other Immediate Family:***     As the *PSR* reports, I have a brother, two parents, my wife and two children (both minors). In its *Sentencing Memorandum,* the Government maintained that "[h]ere, as the defendant's numerous letters of support demonstrate, the defendant's children will have the benefit of a loving and supportive family, including their mother as well as other family members and committed community members." *Id.* (ECF 60), filed March 25, 2023. This assertion badly overstates the situation.

25.     First, while my family lives with my parents, my father and mother are recipients of care, not givers. My mother, who is past retirement age, suffers from vertigo, hyperlipidemia, hypertension, a thyroid disorder and diabetes. She has recently been diagnosed with an aneurysm in her brain and requires babysitting herself. My father is 71 years old and a diabetic, and now suffers from depression. Neither has been in a position to help with the children or to care for Perminder for the past several years. Prior to my leaving, I cared for my parents as well as for Gurveer. **Exhibit 7,** p. 3. My wife is estranged from her family, and in fact does not know where her parents or siblings live.

26.     My brother, Harvinder, who lives in Seaford, New York, about 18 miles from us, about a 40-minute drive away. Harvinder is married with two children, about 11 and 8 years old. For the past three years, he has owned and operated Thiara Liquors Inc. d/b/a Brightwaters Wine & Liquors.[8] The closest of these retail stores is about 15 miles in the opposite direction from his home in Seaford and 40 miles, probably 80 minutes one way in traffic, from where we live in Queens Village. *See* Affidavit of Harvinder Thiara, attached as **Exhibit 13.** In addition to his responsibilities, family, and distance from his home to ours, a serious limitation on my brothers ability to assist is the serious case of gout from which he suffers, an affliction that leaves him in severe pain for days on end and unable to walk. *Id.*

27.     As my wife observes, we have only three family members on whom to draw for help in caring for Gurveer and aiding Perminder. (I do not leave care for my daughter out of the equation, but she is a bright, outgoing high school junior who has no special needs or serious disabilities). Two of those family members, my parents, are old and infirm. My brother is managing three retail establishments some 40 miles from our home and has a young family of his own.

### IV.     Law

28.     A court may not modify a term of imprisonment once it has been imposed except that under 18 U.S.C. § 3582(c)(1), it may do so in a case where

> (A)     the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the

---

[8]     *See Complaint* (ECF 1), Case No. 2:22-cv-1811, filed in the U.S. District Court for the Eastern District of New York. The complaint, a *Federal Labor Standards Act* case, was dismissed without any finding against my brother. The complaint, however, does recite my brother Harvinder's ownership and management of the store and company.

warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that—

(B)

    (i)    extraordinary and compelling reasons warrant such a reduction...

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

29. When Congress enacted Section 3582(c)(1)(A) as part of the *Sentencing Reform Act of 1984*, Pub.L. 98-473, 98 Stat. 1998-99 (October 12, 1984), it directed the United States Sentencing Commission to adopt a policy statement to guide a district court's discretion in determining when "extraordinary and compelling reasons" exist to grant a reduction in sentence. *Mohrbacher v. Ponce*, Case No. 18-cr-00513 (C.D.Cal., July 26, 2018) 2018 U.S. Dist. LEXIS 218929, *18. In response, the Commission promulgated U.S.S.G. §1B1.13, which provides in relevant part that "the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that

(1) an extraordinary and compelling reasons warrant the reduction...[;]
(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
(3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13 did not actually define "extraordinary and compelling reasons." Instead, in an application note, the Commission described three circumstances it believed constituted a nonexclusive list of such reasons, and held (as a fourth circumstance) that compassionate release is warranted if, "[a]s determined by the Director of the Bureau of Prisons, there exists in the

defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the other parts of the Guideline]." *Id.* at n.1(A)(iv). Those three were (1) medical condition of the defendant, (2) age of the defendant, (3) family circumstances of the defendant; and (4) other reasons.

30.     Section 603(b) of the *First Step Act*, Pub.L. 115-391, Title VI, 132 Stat. 5194, 5239 (Dec. 21, 2018), stripped the BOP of its exclusive right to bring § 3582(c)(1)(A) motions. However, due to a lack of quorum that had been ongoing since December 2018 and was finally resolved in summer 2022, the Sentencing Commission was unable to amend § 1B1.13 – which became effective as USSG Amendment 812 – until November 1, 2023. The modification to § 1B1.13 provides the following:[9]

(b)     EXTRAORDINARY AND COMPELLING REASONS.—Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

                                    *    *    *

    (3)     FAMILY CIRCUMSTANCES OF THE DEFENDANT.—

        (A)     The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

        (B)     The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

        (C)     The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

        (D)     The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family

---

      [9]     *See* U.S. Sentencing Commission, *Sentencing Guidelines for United States Courts,* 88 Fed.Reg. 28254 (May 3, 2023), found at https://www.federalregister.gov/documents/2023/05/03/2023-09332/sentencing-guidelines-for-united-states-courts  (last accessed March 10, 2024).

member, when the defendant would be the only available caregiver for such family member or individual. For purposes of this provision, "*immediate family member*" refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

(5)    OTHER REASONS.—The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)

*Id.* The proposed changes also provide that

(d)    REHABILITATION OF THE DEFENDANT.—Pursuant to 28 U.S.C. §994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement. However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted.

*Id.*

31.    This Circuit had joined many others (and led most) in holding that the version of USSG § 1B1.13 in force prior to November 2023 was not binding where a prisoner has brought a § 3582(c)(1)(A)(i) motion. *United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020). The *Brooker* court concluded that the amended § 3582(c)(1)(A) authorizes district courts to make independent assessments of "extraordinary and compelling reasons" - not because § 1B1.13 was inconsistent with the *First Step Act*, but because § 1B1.13 is not an "applicable" policy statement at all. *Id.* at 976 F.3d 235-36. However, once Amendment 812 became effective, courts held, "*Brooker* does not apply to the new version of Policy Statement 1B1.13 because the Policy Statement, as amended, is now 'applicable' to compassionate release motions brought in court by defendants. *United States v. Feliz*, Case No. 16 cr 809 (S.D.N.Y. Nov. 30, 2023), 2023 U.S. Dist. LEXIS 213357, at *10-11, citing 18 U.S.C. § 3582(c)(1)(A).

32.    In *United States v. Jones*, 980 F.3d 1098 (6th Cir. 2020), the 6th Circuit held that "compassionate release hearings are sentence-modification proceedings and that courts

considering motions filed under § 3582(c)(1) must follow a *Dillon*-style test." *Jones, supra* at

980 F.3d 1107, citing *Dillon v. United States*, 560 U.S. 817, 829-30 (2010). *Dillon* reasoned that

"requir[ing] courts to treat the [Sentencing] Guidelines differently in similar proceedings[]

lead[s] potentially to unfair results and considerable administrative challenges"). *Id.*

33. *Jones* defined a three-step § 3582(c)(1)(A) test as follows:

| | |
|---|---|
| Step One: | a court must determine whether "extraordinary and compelling reasons warrant" a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i); |
| Step Two: | a court must determine whether "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A); and |
| Step Three: | a court must "consider" any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case." *Dillon, supra* at 560 U.S. 837. |

*Jones, supra.*

## V. Argument for Grant of Motion

*34.* ***Exhaustion of Remedies:*** There is no question that I have properly exhausted

my remedies under 18 U.S.C. § 3582(c)(1)(A). **Exhibit 1.** I submitted my request for

compassionate release on a form prescribed by the BOP over five months ago. I have received no

response. *See United States v. Pena*, 459 F. Supp. 3d 544, 548 (S.D.N.Y. 2020) (response from

warden or 30 days without a response needed to exhaust remedies for § 3582(c)(1)(A) motion).

35. ***Extraordinary and Compelling Reasons for Grant:*** There is little question that

my family faces challenges that are both extraordinary and compelling, challenges that were not

contemplated at the time I was sentenced.[10] Gurveer's condition is chronic, but the evidence

shows that it has materially worsened since I began serving my sentence. If this were simply a case of Perminder having to balance work with a developmentally disabled child at home, it would be difficult for her but hardly extraordinary. A single mother with two children, one of whom has special needs, approaches an extraordinary situation. But a single parent managing a 10-year-old son with worsening autism and deteriorating skills while she herself suffers from debilitating anxiety and depression is clearly extraordinary. Factor into that the complication of no family support structure able to provide care to Gurveer (or Perminder), and my family's condition becomes both fragile and dire.

36. Thus, compassionate release has little to do with me, but everything to do with Perminder and Gurveer. Without my support, the care mother and son both need is unlikely to be provided. Without my being present to help care for Gurveer and Perminder, their fragile support system is overloaded and will fail.

37. That the need to protect and care for one's child is compelling would seem to be self-evident. Certainly, there are circumstances where others may be available to care for the child or where the movant merely desires to care for the child rather than needs to do so. The existence of such a problem, without more, is an ordinary, not extraordinary, circumstance. *Compare United States v. Johnson*, Case No. 3:16-cr-00242 (M.D. Tenn. Feb. 15, 2022), 2022 U.S. Dist. LEXIS 27856, at *13 (The problem of who will care for minor children while a movant is incarcerated – "without more, is an ordinary, not extraordinary, circumstance.") But here the need is to care for the child and the mother, and the cupboard of alternative caregivers is bare.

---

[10] This is not to say that the extraordinary and compelling reason must be unforeseeable. USSG § 1B1.13(e) expressly holds that "[f]or purposes of this policy statement, an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."

38.     Despite the fact that *Brooker* holds that a defendant's request need not fit within the strictures of U.S.S.G. § 1B1.13 (p.s.), this situation is a solid fit with existing §§ 1B1.13(b)(3)(A). Perminder is not able to provide the extraordinary care that Gurveer needs. Her condition as described by Simran is one of incapacitation brought on by depression and anxiety. What is more, she is fast becoming unable to care for her own needs. § 1B1.13(b)(3)(B).

39.     The extraordinary and compelling need I describe meets the requirements of §§ 1B1.13(b)(3)(A) and (B). The need is not mine. It is Perminder's. It is Gurveer's

40.     ***Section 3553(a) Factors:*** As the third step in deciding an 18 U.S.C. § 3553(a) motion, the Court is required to "consider[]" the 18 U.S.C. § 3553(a) sentencing factors." Those factors include the nature and circumstances of the offense and the history and characteristics of the defendant, and the need for the sentence imposed–

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.*

41.     The Court is aware of my offense, as well as my acceptance of responsibility. For six years after my offense ended, I remained free on pretrial and post-sentence release without committing any other offense. I had no criminal history points, having a record devoid of any criminal convictions before or after this offense. The Court also is aware of the support of my family and community, and knows from letters it received at sentencing that my family and community have continued their support of me without deprecating the seriousness of the offense).

42.     The nature of the offense is a central factor in a § 3553(a) assessment, but so are the history and characteristics of the offender. A court considering compassionate release should not focus on the offense to the exclusion of what has happened since that time. As Chief Judge Roger L. Gregory persuasively argued in *United States v. Kibble,* 992 F.3d 326 (4th Cir. 2021):*Id.* at 992 F.3d 335 (Gregory, C.J., concurring). Rather, the issue should be to assess whether "the defendant's circumstances are so changed… that it would be inequitable to continue the confinement of the prisoner." *Ebbers, supra.* A court must "determine what weight, if any, to give these considerations in evaluating whether they out-weigh the Section 3553 factors supporting Defendant's sentence." *United States v. Cleveland,* Case No. 12-CR-6109 (W.D.N.Y. Sep. 23, 2020), 2020 U.S. Dist. LEXIS 174932, at *3, citing *Ebbers,* supra. As the First Circuit has put it in reviewing a § 3582(c)(1) sentencing reduction, "reasonableness is a protean concept, not an absolute. We think it follows that there is not a single reasonable sentence but, rather, a range of reasonable sentences." *United States v. Rivera-Rodríguez,* 75 F.4th 1, 29 (1st Cir. 2023), citing *United States v. Martin,* 520 F.3d 87, 92 (1st Cir. 2008).

43.     I do not object to the sentence the Court originally imposed, the one it found to be "sufficient but not greater than necessary" to achieve the purposes of 18 U.S.C. § 3553(a). Indeed, I am grateful for the Court's mercy. At the time of the sentence, however,  no one foresaw that Gurveer's progress would reverse, that his disability would deteriorate. While we all understood that it would be difficult for Perminder to manage, we did not foresee that her depression and anxiety would take such a dark turn that she would become unable to work and sit in her room crying instead of caring for the children. And none of us foresaw that Gurveer's abilities would fall as dramatically as the ABAS-III chest shows and that at a time in his life when effort should be made more strongly to prepare him to manage adulthood with his disabilities, would be set back so badly.

44.     The nature of the extraordinary and compelling reason for a sentence reduction necessarily informs the consideration of § 3553(a) factors. Were that not the case, no compassionate release motion would ever be granted unless the court found that the sentence, *ab initio*, was non-compliant with § 3553(a). When the court weighs the § 3553(a) factors now, it must do so while being aware that my incarceration will visit much more suffering on an innocent spouse and disabled child than it will on me.

45.     That the Court granted me both pre- and post-sentencing release indicates that it found I was not a danger to the public within the meaning of 18 U.S.C. § 3142(g). That conduct and my PATTERN risk assessment make clear that granting me a reduction in sentence to time served, with an increase in supervised release time and Imposition of a condition that I spend a portion of that time on Federal Location Monitoring home confinement will adequately protect the public. Indeed, given that I will be sent to home confinement in about 13 months regardless of the disposition of this motion suggests that to do so now will not – given the family circumstances – undercut the policies informing the 18 U.S.C. § 3553(a) sentencing factors.

46.     Under these very unusual circumstances, and with regard for the compelling nature of Perminder's and Gurveer's needs, a sentence reduction to time served (with an expansion of supervised release and a home confinement condition) would adequately reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. No reasonable member of the public will conclude that because I was permitted home confinement so that I could care for a suffering wife and developmentally challenged child somehow conferred a benefit on me that promoted disrespect for the law. One would be

18

challenged to find any defendant sufficiently hard-hearted to wish that he had a mentally disabled wife and suffering child in order to get a better sentence.

47. Gurveer's and Perminder's worsening conditions are a situation that is dire, an exception – if ever there was one – to the advisability of a continuing carceral sentence. Thus, I ask that the Court resentence me to time served, with an expansion of supervised release equal to the remainder of the statutory sentence I would serve with good-conduct time and FSA credits under 18 U.S.C. § 3624(b) and (g). The additional supervised release would include all of the conditions specified in the *Judgment*, as well as additional conditions that I adhere to conditions of home confinement. *See, e.g., United States v. Cantu*, 423 F. Supp. 3d 345, 354-55 (S.D. Tex. 2019) (granting a defendant sentence reduction while imposing home confinement on supervised release "adequately expresses the seriousness of the offense, deters criminal conduct, and protects the public").

48. Courts have acknowledged that release to home incarceration can "reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for the defendant's crimes." *United States v. White*, Case No. 2:17-cr-00198-4 (S.D.W.Va. June 12, 2020), 2020 U.S. Dist. LEXIS 103974, at *16 *citing United States v. Campagna*, Case No. 16cr78-01 (S.D.N.Y. Mar. 27, 2020), 2020 U.S. Dist. LEXIS 54401, at *1, 9). One court observed that "[i]n some respects, home confinement will result in less freedom of movement than [the defendant] would have in a prison environment that offers large recreational areas and educational opportunities." *United States v. Young*, Case No. CR19-5055 (W.D. Wash. May 22, 2020), 2020 U.S. Dist. LEXIS 90537, at *11.[11]

---

[11]     *See also United States v. Springer*, Case No. 20-5000 (10th Cir. July 15, 2020), 2020 U.S. App. LEXIS 21947, at *3-4 (defendant's "transfer to home confinement is not a

49.     Courts have found that placement in home confinement for a portion of a prisoner's term of supervised release provides protection to the public and otherwise serves the 18 U.S.C. § 3553 sentencing factors. In *United States v. Gardner*, Case No. 14-CR-20735-001 (E.D. Mich. July 22, 2020), 2020 U.S. Dist. LEXIS 129160, at *24, the court held that imposition of a term of home confinement as a condition of supervised release would "afford an additional protection to the public." *See also United States v. Hoover*, Case No. 5:16-cr-58 (D.Vt. May 18, 2020), 2020 U.S. Dist. LEXIS 126763, at *6-7 ("There is reason for optimism that under supervision, Mr. Hoover will remain on the right side of the law"); *United States v. Pomante*, Case No. 19-20316 (E.D. Mich. May 15, 2020), 2020 U.S. Dist. LEXIS 85626, at *21-23 ("The Court also agrees that proper safeguards would ensure that Defendant continues to serve her term to completion and comply with Court guidelines. The Court reduces Defendant's term of imprisonment portion of her sentence to time served, and the Court imposes a term of supervised release equal to the unserved portion of her original term of imprisonment"); *United States v. Sawicz*, 453 F. Supp. 3d 601, 606 (E.D.N.Y. 2020) (defendant serving term for child pornography and supervised release violation resentenced to time served, with court holding that "[u]pon his release from prison, the defendant will quarantine himself at home with his parents;

---

release from imprisonment, nor does this transfer reduce the length of his custodial sentence… [E]ven though a prisoner is… in home confinement, he is still serving a 'term of imprisonment.' When read together, [18 U.S.C. §§ 3621 and 3624(c)] plainly indicate that a person is in the BOP's 'custody' while serving the remainder of a sentence in home confinement" (internal citation omitted)). *See also Melot v. Bergami*, 970 F.3d 596, 599 and n.13 (5th Cir. 2020) (placement of a prisoner by BOP in home confinement under 34 U.S.C. § 60541(g) "elderly offender home detention program" is a "change in confinement from a prison facility to home detention" and is properly considered to be a change in "conditions of confinement" that cannot be challenged in a 28 U.S.C. § 2241, a conclusion that is "consistent with 18 U.S.C. § 3621, which gives the BOP the authority and discretion to designate the place of a convicted offender's confinement").

assuming that he complies with that directive – and I have no reason to believe that he would not – he would pose little, if any, risk to the public").[12]

    50.    This Court is fully empowered by § 3582(c)(1)(A) to reduce my remaining sentence of imprisonment to time served, expanding my supervised release term, and imposing a condition of home confinement on the expanded supervised release term. *United States v. Al-Jumail*, 459 F. Supp. 3d 857, 866 (E.D. Mich. 2020) (Court reduced defendant's term of imprisonment portion of his sentence to time served, and imposed a term of supervised release equal to the unserved portion of his original term of imprisonment); *Gardner, supra* at 2020 U.S. Dist. LEXIS 129160, *25 (As condition of compassionate release, defendant restricted to his residence, according to a curfew as directed by the probation officer, for at least six months); *United States v. Cannon*, Case No. 15-20783 (E.D. Mich. Oct. 5, 2020), 2020 U.S. Dist. LEXIS 183984, at *17 (Reducing a sentence to time served, the court imposed a new term of supervised release equal to the unserved portion of the original term of imprisonment, following which the defendant would serve the previously-imposed term of supervised release with the first 12 months of expanded supervised release to be served on home confinement); *United States v. Gonzalez*, Case No. 2:18cr232 (E.D.Wash. December 31, 2020), 2020 U.S. Dist. LEXIS 56422 at *10; *United States v. Atkinson*, Case No. 2:19-CR-55 (D.Nev. Apr. 17, 2020), 2020 U.S. Dist.

---

    [12]    See also *United States v. Burnside*, Case No. 18-CR-2068, 2020 U.S. Dist. LEXIS 112708, at *30-32 (N.D. Iowa June 18, 2020) ("[T]he continued restrictions imposed on [defendant] through home confinement and supervised release, together, satisfy the goal of imposing sufficient punishment. Releasing defendant under these circumstances would not undermine the goal of deterrence").

LEXIS 68240, at *10, and *United States v. Mogan*, Case No. 14-040 (E.D. La. May 19, 2020), 2020 U.S. Dist. LEXIS 88511, at *7 (same procedure followed).

## VI. Conclusion

51.    A mother is struggling with Major Depressive Disorder and anxiety, so crippling that she can no longer work or care for her children. One of those children suffers from Autism Spectrum Disorder and ADHD, and such progress that has been made with his abilities and education in the past two years is being lost. It is reasonably likely that my presence in the home, even under tightly regulated conditions, may make the difference.

WHEREFORE, this *Motion* should be granted, and I should be resentenced to time served, with an extension of supervised release not to exceed the amount of the sentence of incarceration remaining served, with a condition of home confinement and such other conditions as the Court considers appropriate.

Executed ____4/11/____, 2024

*Bahader Thiara*
Bahader Thiara
Reg. No. 91685-053
USP Lewisburg Satellite Camp
P.O. Box 1000
Lewisburg, PA  17837

22

CERTIFICATE OF SERVICE

I herewith certify pursuant to 28 U.S.C. § 1746 that I have transmitted a manually-signed original of the foregoing *Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)* by legal mail, first class, postage prepaid, to the following:

> Office of the Clerk
> United States District Court
> 225 Cadman Plaza East
> Brooklyn, NY 11201

and I have served a true and complete copy of the same by depositing said document by email and by first-class mail, postage prepaid, addressed to the following:

> Adam Amir
> Ass't U.S. Attorney
> Eastern District of New York
> 271A Cadman Plaza East
> Brooklyn, NY 11201

The foregoing statements are true under penalty of perjury.

Executed: ___4|1|___, 2024

Bahader Thiara
_____
Bahader Thiara

Inmate Name: _BAHADER THIARA_
Register Number: _91685053_
Federal Prison Camp
P.O. Box 2000
Lewisburg, PA 17837



0 2 APR 2024

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
225 CADMAN PLAZA EAST
BROOKLYN, NY 11201

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ APR 0 4 2024 ★
BROOKLYN OFFICE

LEGAL MAIL